(C.D. 2663)

Gold Coast Flower Co-Operative *v.* United States

United States Customs Court, Third Division

(Decided April 26, 1966)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Arthur H. Steinberg*, trial attorney), for the defendant.

Before Donlon and Richardson, Judges

Donlon, Judge: The merchandise of these two consolidated protests is described as fern roots, in the invoices which were filed with

the entry documents. The fern roots are aerial and, as imported, they are dormant; the roots are twisted around sphagnum moss and around certain objects which are identified, respectively, as an earthenware comic monkey clinging to a piece of wood (protest 64/1170) and as a bamboo sitting crane with open mouth (protest 63/23157). Twine and galvanized wire are used to keep these ensembles together.

The merchandise of these suits was exported from Japan. It was entered at Los Angeles, on May 24, 1962 (protest 64/1170) and on August 14, 1962 (protest 63/23157).

The collector classified the "comic monkey" as a manufactured article in chief value of earthenware, not specially provided for, other than tableware, valued at more than $3 but less than $10 per dozen pieces, charged with duty at 10 cents per dozen pieces and 30 per centum ad valorem, under paragraph 211 of the Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade (T.D. 53865).

The "sitting crane" was charged with duty at 25 per centum ad valorem, under paragraph 409 of the Tariff Act of 1930, as modified, *supra* (T.D. 53865), as an article, not specially provided for, partly manufactured of bamboo.

The protest in 63/23157 (sitting crane) claims duty at 11 per centum under paragraph 754. The protest in 64/1170, as originally filed, claimed duty at 10 per centum under paragraph 1558, evidently as a nonenumerated manufactured article. At the opening of trial before Judge Lawrence in Los Angeles, plaintiff's counsel moved to amend this protest to claim a duty rate of 12½ or 11 per centum under paragraph 754. This merchandise was entered on May 24, 1962, when the effective rate was 12½ per centum. The amendment was granted.

There appears to have been no motion to amend the protest in 63/23157, which claims under paragraph 754 at 11 per centum. The importation of that protest was entered on August 14, 1962, after the rate had been reduced to 11 percent.

While not as precisely stated as might be wished, we accept the statement of plaintiff's counsel in open court as covering both protests, namely, that plaintiff claims enumeration of this merchandise "under paragraph 754 as greenhouse stock other than orchid plants, not specially provided for" (R. 2) at whatever the applicable rate was on the entry date. On this construction of the protests, we proceed to examine the record before us.

The claim in protest 64/1170, under paragraph 1558, has not been prosecuted. It is deemed abandoned, and will be dismissed.

At the close of trial, defendant moved to dismiss protest 63/23157 as insufficient. That motion has now been withdrawn. (Defendant's brief, p. 1.) Evidence was adduced by defendant bearing on the

issue raised by its motion, but in view of the withdrawal it is unnecessary for us to weigh that evidence or to rule on the motion.

There is in evidence a sample of the sitting crane, in condition as imported. There is no sample of the comic monkey. There are also in evidence photographic representations of such or similar imported articles after they have been treated subsequent to importation, in a manner more particularly described hereafter. When the fern leaves develop under such treatment, the articles appear, from the photographic exhibits and from oral testimony, to be the "comic monkey," or the "sitting crane," enwreathed in a twisted or entwined, verdant and well leafed fern vine. As such, they are ready for sale to gift shops and flower shops as decorative objects.

Mr. Tak Muto, general manager of plaintiff Gold Coast Flower Co-Operative, testified. He said that he has spent a lifetime in the business of growing and selling flowers. Asked on direct examination if he dealt in horticultural products, he replied "Ornamental horticulture." (R. 3.)

Mr. Muto said that he has been familiar with the fern root comic monkey (protest 64/1170) since 1960. He produced a photograph which illustrates the dormant fern root, woven around the comic monkey, in its condition as imported. (Illustrative exhibit 1.) He identified the fern root by its botanical name, *Davalia Bullata*, the aerial roots of which, so he testified, form into various shapes. (R. 6.)

Mr. Muto testified that after importation he treats the fern roots with fungicides and insecticides, and places them in cold storage for 30 days, after which he puts them in a greenhouse subject to high humidity.

Exhibit 2 is a photograph illustrative of the way the comic monkey looks as it is sold in the United States. As illustrated, ferns are growing out of the root which surrounds the monkey. The roots require watering; and, depending on the care given, a fern root will keep for about a month under home conditions, Mr. Muto said. Under greenhouse conditions, and with proper care, the "monkey fern" will keep indefinitely. It is a perennial.

Mr. Muto said that nursery stock is generally understood in the trade to consist of growing plants for outdoor landscaping, whereas greenhouse stock consists of growing plants which need a controlled environment and are intended for use indoors. In Mr. Muto's opinion, the monkey fern is an "ornamental inside greenhouse type of product."

On cross-examination, Mr. Muto testified that he is familiar with how the imported "comic monkeys" are processed in Japan. The monkey head is made of earthenware, set in a mold, and painted. Galvanized wire is used to simulate the shape of the monkey's body,

and fern roots and sphagnum moss are wrapped around this wire and tied with jute twine.

The reason the "comic monkeys" are put in cold storage after importation is to condition them. If there should be humidity inside their containers, they will rot. In cold storage, however, they keep for as long as a year.

Mr. Muto did not know whether the "comic monkey" was kept in a greenhouse before its importation, but he would "hope not," since it "[s]hould be dehydrated": otherwise, it would mold in the containers in which the monkeys are shipped.

As to use, Mr. Muto testified that "comic monkeys" are hung in kitchens and dens, as ornamental decorative house plants. They are used as gift items in little garden arrangements, or set on trays, or used in floral novelties.

Mr. Muto gave substantially the same testimony as to the sitting crane with open mouth, a sample of which is in evidence as exhibit 3. The only difference in material is that the crane's beak is of bamboo, while the monkey's head is of earthenware. Exhibit 4 illustrates the condition in which the sitting crane is sold, with the fern in leaf, growing out of the entwined root. Mr. Muto was of opinion that the fern root sitting crane, as imported, is a tropical plant to be grown under environmental conditions.

Defendant's exhibit A, in evidence, enumerates various types of animal shapes with which fern root is combined and the respective materials thereof, including the "comic monkey" and the "sitting crane," marked on exhibit A as "A" and "B," respectively.

The competing statutory provisions, with which we are concerned, are as follows:

Paragraph 211, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865.

Earthenware * * * and manufactures in chief value
  of such ware, not specially provided for:

  *       *       *       *       *       *       *

Articles which are not tableware, kitchenware,
  or table or kitchen utensils, valued per dozen
  articles—

  *       *       *       *       *       *       *

        $3 or more but under $10_____ 10¢ per doz.
                                                  pieces and
                                                  30% ad val.

Paragraph 409, as modified, *supra*, T.D. 53865.

All articles not specially provided for, wholly or partly
  manufactured of * * * bamboo, * * *:

  *       *       *       *       *       *       *

      Other _____ 25% ad val.

Paragraph 754, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

Cuttings, seedlings, and grafted or budded plants of
other deciduous or evergreen ornamental trees, shrubs,
or vines, and all nursery or greenhouse stock, not
specially provided for:

| * | * | * | * | * | * | * |

Other _____ 12½% ad val.

Paragraph 754, as modified by the reciprocal agreements supplemental to the General Agreement on Tariffs and Trade, T.D. 55615.

Cuttings, seedlings, and grafted or budded plants of
other deciduous or evergreen ornamental trees, shrubs,
or vines, and all nursery or greenhouse stock, except
orchid plants, not specially provided for _____ 11% ad val.

It appears to be plaintiff's contention that the "comic monkey," as imported, is an article that is described both in paragraph 754 (greenhouse stock) and in paragraph 211 (manufactures in chief value of earthenware), and that the rule of relative specificity requires that it be classified under paragraph 754.

Similarly, as to the "sitting crane," plaintiff's contention is that this is both greenhouse stock (paragraph 754) and an article partly manufactured of bamboo (paragraph 409), and that the rule of relative specificity requires that it be classified under paragraph 754.

Defendant argues, to the contrary, that these articles are not described in paragraph 754, and hence the rule of relative specificity does not enter into consideration of their classification.

Relative specificity is a judicially contrived method of determining, whenever an article is described in more than one tariff enumeration, which of the enumerations more specifically describes the article. Like so many of our judicial rules in tariff litigation, relative specificity of enumeration has as its sole purpose the interpretation of the intention of Congress and the application of that intention to a particular state of facts. *United States* v. *Clay Adams Co., Inc.*, 20 CCPA 285, T.D. 46078; *United States* v. *American Import Co.*, 26 CCPA 283, C.A.D. 28.

Unless an article is enumerated in two or more tariff classifications, there is no occasion to resort to the doctrine of relative specificity in order to determine in which of those classifications Congress intended duty to be charged on that particular article. There is no issue as to the comic monkey being, in fact, an article in chief value of earthenware, not specially provided for, other than tableware, and valued at more than $3 but less than $10 per dozen pieces. There is no issue as to the sitting crane being an article, not specially provided for, partly manufactured of bamboo. The first issue, and an issue we must decide

before we come to any consideration of the relative specificity of different enumerations, is whether these articles are also described in paragraph 754 as greenhouse stock, as plaintiff claims.

We are cited in the briefs to no case in which the tariff term "greenhouse stock" has been construed, and our own research discovers none. That construction seems to be an issue of novel impression.

Plaintiff, in its brief, pays little or no attention to the word "stock," concentrating argument on the sense in which Congress intended the word "greenhouse" to be construed. We have no difficulty in deciding what a greenhouse is. But what is greenhouse stock?

In Webster's New International Dictionary, 1956 edition, the definitions of the noun "stock" include the following:

29. *Hort.* The stem or plant in which a graft is inserted; also, any plant from which slips or cuttings are taken.

That this is the sense in which the United States Tariff Commission understood the meaning of the word "stock," as used both in paragraph 752 and paragraph 753 of the Tariff Act of 1922, seems evident from a reading of the Summary of Tariff Information compiled in 1929 for the use of the Committee on Ways and Means of the House of Representatives, which then had before it the bill which later became the Tariff Act of 1930. Paragraph 754, Tariff Act of 1930, is identical with paragraph 752 of the 1922 Act, except as to certain value figures and duty rates. The 1929 Summary of Tariff Information relative to the act that was before Congress when it reenacted this tariff enumeration is relevant, therefore, to our consideration of what Congress intended by the term it used.

The descriptive headings in the summary, with respect to paragraph 752, use the expression "ornamental *propagating* stock and plants," in discussing ornamentals (p. 1316). Under "Nursery and Greenhouse Stocks, n.s.p.f.," it is recited that "this classification includes a great variety of plants and propagating stocks."

Consistent with the importance of fruit growing in the economy of the country, the discussion under paragraph 753 refers by name to apple stocks, cherry stocks, pear stocks, plum stocks, quince cuttings, and propagating stock of grapes and other fruit vines and bushes. It is stated that France supplies the bulk of the imported fruit-propagating *stock* with the exception of grapes; that practically all of the small fruits used in the United States are propagated from domestic *stocks;* and that fruit tree seedlings are grown from seed for one or two seasons for use as *stocks* upon which to engraft scions or buds of the varieties desired.

In the Encyclopædia Britannica, 1947 ed., in discussing the propagation of plants by vegetative means, which results in progeny identical in genetic make-up to one another and to the parent plant from which they are secured, it is noted that this is of great importance in horticul-

ture and is not obtainable in production from seed. In vegetative propagation, according to the Encyclopaedia Britannica, the "portion of a plant which serves for the root or under-portion is called the 'root-stock' or 'stock,' and the portion of a plant which is placed upon the stock is called 'scion.' In combining a stock and a scion, various techniques are employed, all of which are a form of grafting. A common form is called 'budding' in which a single bud is grafted onto the stock during the active growing season, as contrasted with grafting with dormant scions in midwinter or early spring." (Vol. 11, p. 779.)

All this is common knowledge to a legion of home gardeners, including many judges, as well as to greenhousemen and nurserymen. It was known to the Tariff Commission, as shown by the Tariff Summary. That the members of Congress knew what *stock* meant in horticulture, is hardly susceptible of doubt.

It seems to us clear that Congress intended, by the word *stock*, no meaning different from the horticultural definition. "Stock" has similar meaning, whether it is greenhouse or nursery stock. In the context of paragraph 754, that is evident.

Fruit *stock* is a plant for the taking of cuttings, or a stem or root on which to engraft a bud or scion, to propagate fruit trees or plants. Nursery *stock* is a plant for the taking of cuttings, or a stem or root for grafting, in order to propagate such trees or plants as a nursery commonly propagates. Greenhouse *stock* is the same, but of the kind usual in the greenhouse process of propagating plants and other ornamentals, such as greenhouses commonly propagate.

There is no evidence before us which identifies these importations as *stock*, greenhouse or otherwise. That is the sole claim which plaintiff makes. Since the claim that these are greenhouse *stock* has not been established by plaintiff's proofs, there is no such duplication of descriptive enumeration as would require, or permit, us to weigh relative specificity, the tariff theory on which plaintiff relies.

The oral evidence, moreover, does not support the claim that this is stock. As to the "sitting crane," Mr. Muto testified that the fern root of that item is a plant. He did not, and probably could not, call it *stock*. The fern root of the "comic monkey" is not in evidence, but all we have of record identifies it with the fern root of the "sitting crane."

Not every plant in a greenhouse is greenhouse stock. Had Congress intended such comprehensive enumeration, we may presume it would have said so.

Plantiff has not overcome the presumptively correct classification. The claim in these protests for classification as greenhouse stock is overruled. The claim in protest 64/1170 under paragraph 1558 is dismissed.

Judgment will be entered accordingly.